## The UNITED STATES of America

### v.

## Mitchell Wayne BJERKE, also known as "Mitch Bjerke", Constance L. Brown, Margaret Scott, and Martha Zoller.

### Appeal of UNITED STATES of America.

### No. 85–3653.

United States Court of Appeals, Third Circuit.

Argued June 5, 1986.

Decided July 10, 1986.

Rehearing and Rehearing In Banc Denied Aug. 7, 1986.

J. Alan Johnson, U.S. Atty., Constance M. Bowden (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellant.

H. David Rothman (argued), Pittsburgh, Pa., for appellees.

Before ADAMS, WEIS, and HIGGIN-BOTHAM, Circuit Judges.

**OPINION OF THE COURT**

ADAMS, Circuit Judge.

These cases arise from the efforts of the United States Postal Service to bar potentially disruptive charitable solicitation on its property, efforts which frustrated an attempt by political activists to solicit financial contributions near the doorways of two local post offices. The United States Magistrate found the four defendants guilty of soliciting and depositing literature in violation of applicable Postal Service regulations. Relying in part on the First Amendment, the district court vacated all the convictions. Because we differ with the district court's constitutional analysis, we will reverse and remand the matter in order that a portion of the magistrate's judgment may be reinstated.

**I.**

The four defendants—Mitchell Bjerke, Constance Brown, Martha Zoller, and Margaret Scott—are affiliated with the National Democratic Policy Committee. That organization is closely associated with Lyndon H. LaRouche, Jr., an independent candidate for President on several state ballots in the 1984 general election.

Beginning in the early summer of 1984, defendants engaged in political activities outside a number of post offices in the Pittsburgh area. Their usual practice was to set up a card table near a post office entrance, and then to encourage those using the post office facilities to purchase political literature displayed on the table.

At three post offices—McKnight, Monroeville, and Mars—defendants were issued citations and charged with depositing nongovernmental literature on postal premises, in violation of 39 C.F.R. § 232.1(o) (1985), and soliciting contributions on such property, a violation of 39 C.F.R. § 232.1(h)(1) (1985). Following conviction before the magistrate on all counts, the district court vacated the convictions, ruling that there was insufficient evidence to support the charges of depositing literature, and that the convictions of Bjerke and Brown for

soliciting abridged their First Amendment rights.

The solicitation charges against Bjerke and Brown, the subject of this appeal by the government, are based upon three incidents: On November 16, 1984, Brown was observed at a card table set up on a walkway four to five feet from the entrance of the McKnight post office in Pittsburgh, attempting to solicit contributions; on December 12, 1984, Bjerke engaged in similar activity on a grassy area a little farther from the entrance; and on November 29, 1984 both Bjerke and Brown were seen at a table set up on a walkway one foot from the entrance of the post office in Monroeville, Pennsylvania. For these incidents, the magistrate imposed fines and assessments totalling $100 each on Bjerke and Brown.

There is no evidence that defendants at any time blocked access to the buildings. Nor is there any showing that defendants' activities caused any disturbance at the Monroeville facility. However, there is considerable evidence that the operations at the McKnight post office were affected by the solicitors.

Both the McKnight branch manager and another postal official testified that over a six-month period numerous customers of the post office complained about the solicitations, causing window clerks and the managers themselves to spend a significant amount of time placating irate patrons. Twenty customers added their names to a list of complainants maintained by clerks, until the branch manager ended the practice of keeping a list of complaints. In addition, the McKnight manager stated, regular bulk mailers began arriving late in the day in order to avoid the activists, requiring the post office to stay open as much as a half-hour beyond its regular closing time.

The United States has filed a timely appeal, contesting only that portion of the district court's ruling holding that Bjerke and Brown's convictions for soliciting violate the First Amendment.

## II.

■ A preliminary question is whether this Court has jurisdiction to review the district court's decision favoring the defendants. The prosecution asserts that our jurisdiction rests on 18 U.S.C. § 3731 (1982). That statute reads, in relevant part:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

Defendants argue first that because this prosecution for petty offenses was initiated by citations, and not an indictment or information, the statute is inapplicable. But in *United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975), the Supreme Court held that § 3731 is designed to remove all barriers to appeals by the government in criminal cases, and to permit such appeals wherever the Constitution so allows. In addition, the statute itself states: "The provisions of this section shall be liberally construed to effectuate its purposes." Accordingly, it is reasonable to permit an appeal even where the case involves a petty offense. *United States v. Moore*, 586 F.2d 1029, 1031 (4th Cir.1978) (violation notice for petty offense is "functional equivalent" of indictment or information); *see also United States v. Lee*, 786 F.2d 951, 956 (9th Cir.1986).

■ The relief sought by the United States is also within the contemplation of the statute. After the district court's decision, the only course available to the magistrate is dismissal of the citations on which the charges are based. Section 3731 permits the government to appeal under these circumstances. *See United States v. Beck*, 483 F.2d 203, 206 (3d Cir.1973) (looking to the "practical effect" of the district court's decision), *cert. denied*, 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed.2d 757 (1974).

■ Further, double jeopardy presents no bar to this Court's review of the district court's order vacating convictions entered by a magistrate. The double jeopardy clause is implicated only where there is a threat of multiple punishments or a second prosecution. *Wilson*, 420 U.S. at 344, 95 S.Ct. at 1022. Such is not the case where, as here, the appellate court is asked only to reinstate a vacated verdict. *Id.* at 345, 95 S.Ct. at 1022.

Therefore, we hold that § 3731 provides this Court with jurisdiction over the present appeal by the government, and there is no constitutional bar to such an appeal. Other courts of appeals have reached the same conclusion in cases involving district court reversals of convictions entered by magistrates. *United States v. Forcellati*, 610 F.2d 25, 29–30 (1st Cir.1979), *cert. denied*, 445 U.S. 944, 100 S.Ct. 1342, 63 L.Ed.2d 778 (1980); *Moore, supra*.

## III.

Our analysis of the merits begins with the applicable Postal Service regulation. It states:

Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, commercial soliciting and vending, and displaying or distributing commercial advertising on postal premises are prohibited.

39 C.F.R. § 232.1(h)(1) (1985). As the government concedes, the rule does not prohibit the distribution of literature or the discussion of public affairs on post office property.[1]

The government further concedes that solicitation activities are expressive speech within the protection of the First Amendment. "[S]olicitation is characteristically intertwined with informative and perhaps

---

1. The district court vacated defendants' convictions under § 232.1(*o*), which prohibits "depositing or posting handbills" on postal premises, holding that this regulation does not bar the mere distribution of literature. The prosecution now agrees, and does not contest this ruling.

persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and ... without such solicitation the flow of such information and advocacy would likely cease." *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980). *See also Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* —— U.S. ——, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985).

Nonetheless, the United States contends that the content-neutral prohibition of financial solicitation on postal premises is a constitutionally valid exercise of control over its property.

### A.

In a long line of cases, the Supreme Court has made clear that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (upholding trespass conviction arising out of demonstration held on the nonpublic grounds of a county jail). Thus, whether the government must permit access to public property for expressive activities depends on the nature of that property.

The Supreme Court recently set forth the appropriate analysis for resolving claims of access to public property in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* —— U.S. ——, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). If the public property to which individuals seek access is a traditional public forum such as a street or park, the Court explained, any exclusion must be based on a compelling state interest, narrowly tailored to promote that interest. A time, place or manner restriction is also permitted if it is content-neutral, and if it is designed to advance a significant governmental interest. *Id.,* 105 S.Ct. at 3448. The same rules apply to a nontraditional forum that is designated by the government as a public forum, *id.,* but officials

may choose to close such a designated public forum at any time. *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). However, restrictions on access to government property that generally has not been open for public expression, characterized by the Supreme Court as a "nonpublic forum," need be only reasonable and content-neutral. *Cornelius,* 105 S.Ct. at 3448.

Defendants were charged with conducting activities on or near walkways located on postal premises. We must therefore consider the Supreme Court's decision in *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). In *Grace,* the Court held that a public sidewalk surrounding the Supreme Court building is a public forum, even though included in a statutory description of Court property on which certain expressive activity was forbidden. *Id.* at 179, 103 S.Ct. at 1708. But *Grace* does not stand for the proposition that any outdoor path is a traditional public forum.

In *Grace,* the Court focused on a sidewalk bordering streets that appeared identical to the public sidewalks found in every urban area. As the Court observed regarding the area at issue, "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* In contrast, the *Grace* Court distinguished *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), which held that streets and sidewalks of a military reservation open to the public only on a limited basis constitute a nonpublic forum. In *Greer,* even though civilians were freely permitted to visit unrestricted areas, signs were posted at the reservation entrances barring solicitors and warning of possible vehicle searches, thus making it clear to persons approaching that they were departing from public thoroughfares. *Id.* at 830, 96 S.Ct. at 1213. *See also Student Coalition for Peace v. Lower*

*Merion School District Board of School Directors,* 776 F.2d 431 (3d Cir.1985) (school athletic field that was fenced but unlocked did not become a public forum simply because it was used for park-like activities).

The dissent suggests that *Greer's* finding of a nonpublic forum is based not on the Supreme Court's view of "the lay of the land," but instead on military necessities. Post at 654. This position, however, fails to consider the effect of *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam), in which the Court held that the streets of a military reservation were a public forum where officials had "abandoned any claim of special interest in regulating" expressive activity. *Greer,* 424 U.S. at 837, 96 S.Ct. at 1217. Thus, the *Greer-Flower* distinction illustrates the point that where the walkway is clearly within the perimeters of government property—as opposed to the situation in *Grace*—the government may choose to restrict the use of the walkway and limit public expression at that location.

**B.**

■ A multitude of different layouts and geographical configurations characterize the thousands of post offices in the United States. Undoubtedly, some of these facilities include exterior walkways that, although nominally within federal property, are indistinguishable from public sidewalks. In those situations, *Grace* suggests that those paths be considered public forums.

Defendants contend that because the regulatory ban on solicitation present in this case applies indiscriminately to all outdoor walkways, including those indistinguishable from sidewalks, it is overbroad and an invalid restraint on First Amendment rights. But this proposition is not as clear as defendants suggest. A statute or regulation that is broadly applicable to public forum property is not per se infirm; as noted, such a proscription may be justified by a sufficient governmental concern. In any event, the case at hand does not pro-

vide the proper occasion for an overbreadth challenge. It is true that one may question an overbroad provision even if a properly limited ordinance could validly apply to his own conduct. But in order to make such a challenge the overbreadth must be "substantial." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).

Here, defendants made no showing concerning the physical layout of any post offices other than those at which they engaged in soliciting. Thus, on this record, we are unable to determine whether the regulation at issue is substantially overbroad in its application to outdoor walkways.

As defendants have failed to assert a sufficient challenge to the regulation based on its alleged overbreadth, we decline to resolve whether the regulation may apply to exterior walkways that are indistinguishable from public sidewalks, like those in *Grace.* Instead, we turn to the question whether defendants' particular activities at the McKnight and Monroeville post offices were properly subject to regulation. We conclude that the provision as applied to these activities does not offend the Constitution.

**C.**

■ The particular areas used by defendants for solicitation are nontraditional public forums. At the McKnight and Monroeville post offices, the two facilities involved in this appeal, the entrance areas are set well back from public thoroughfares. At both locations, an exterior walkway abuts the post office building, and a parking lot, also on postal premises, separates that walkway from the street. At Monroeville, a walkway connects the path in front of the building with the street, but

the former walkway does not lead directly to the post office entrance where defendants conducted their affairs. The factual situation in this case is thus more analogous to the sidewalks in the military reservation in *Greer* than to the public sidewalk in *Grace;* the walkways are not traditional public forums, since any person who has crossed the McKnight or Monroeville parking lot and stepped onto a walkway adjacent to the post office has entered an enclave separated from the public thoroughfare. The government is permitted to maintain such nonpublic enclaves.

It is clear that the walkways at issue here, bordering free-standing buildings a good distance removed from the street, could not be confused with municipal sidewalks. There is no evidence in the record that contradicts this. Thus, this case is not similar to *Grace*, in which public sidewalks became nonpublic only by congressional edict. Here, the Postal Service has constructed and maintained walkways well inside the perimeters of its own property. Contrary to the dissent's suggestion, we believe it is of no moment that the McKnight and Monroeville walkways are the only avenues available for customers wishing to enter those post offices. As the Supreme Court cases since *Adderley* indicate, the government may restrict the use of its property and dedicate it as a nontraditional forum; it need not open for public discourse property dedicated to other purposes, even if that property would provide a useful arena for those wishing to express their views.

The walkways in question were not dedicated to serve the traditional functions of streets or parks, but rather for the particular function of accommodating post office patrons on official business, unlike the urban sidewalks in *Greer*. Indeed, it can hardly be doubted that the function of Postal Service property is to facilitate the provision of efficient postal services, and not to provide a public platform for political advocacy. *See* 39 U.S.C. § 101(a) (1982).

At bottom, this is a simple case in which the Postal Service, as owner of the property in question, has barred certain activities immediately adjacent to post office entrances. The Supreme Court has directed repeatedly and emphatically that governments must be permitted reasonable control over such nontraditional public forums. *See, e.g., Cornelius,* 105 S.Ct. at 3448; *Perry,* 460 U.S. at 46, 103 S.Ct. at 955; *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981); *Greer,* 424 U.S. at 836, 96 S.Ct. at 1216; *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2716–17, 41 L.Ed.2d 770 (1974); *Adderley,* 385 U.S. at 47, 87 S.Ct. at 247.

Defendants also argue that the Postal Service has effectively created public forums outside McKnight and Monroeville as a result of certain practices. They note that no regulation bars public speaking or the distribution of literature outside post offices, and that newspaper vending machines and a gumball machine encouraging charitable contributions were found at postal facilities in the area.

However, that the government permits selective access to a nontraditional forum does not manifest an intent to designate an area a public forum for all expressive purposes. In *Cornelius*, for example, a charitable fund-raising drive conducted by federal employees allowed the participation of 237 voluntary agencies, but excluded legal defense and political advocacy groups which desired to participate. The Supreme Court held that this limited access to a nonpublic forum did not create a public forum. 105 S.Ct. at 3450. Similarly, in *Perry*, a school district permitted use of internal mailboxes by the teachers' elected labor representative, as well as by civic and church groups such as the YMCA and Cub Scouts, but denied access to a rival teachers' union. The Court held: "This type of selective access does not transform government property into a public forum." 460 U.S. at 47, 103 S.Ct. at 956.

The post office entrances in question here were nonpublic areas, and there is no evidence of any official intent to designate these areas as forums for unlimited public expression. Accordingly, we must analyze the Postal Service's ban on solicitation outside McKnight and Monroeville in accord with the appropriate constitutional standards for nonpublic forums.

### D.

■ As stated earlier, a regulation of expression on government property that is a nonpublic forum will be sustained if it is reasonable, and does not discriminate on the basis of content. The provision at issue meets these tests as applied to the areas immediately adjacent to the McKnight and Monroeville post office entrances, where defendants were cited for their actions.

The federal bar on solicitation on postal premises is content-neutral. It does not discriminate on the basis of the speaker's message, nor does it preclude all expression regarding any particular topic. *See Consolidated Edison Co. of New York, Inc. v. Public Service Commission*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980). Rather, it merely deprives the speaker of one means of expression found disruptive by Postal Service officials.

According to these officials, solicitation activities are especially likely to interfere with their mission to provide reliable postal services. Before 1978, the Postal Service allowed solicitation in post office lobbies by designated charitable organizations. It then determined that this practice was unsatisfactory, since it caused crowding of needed lobby space, and required employees to apportion the scarce area. *See* 43 Fed.Reg. 38824 (1978). As a result, the regulation at issue here was promulgated.

In the present case the district court determined that the record demonstrates that the regulation is necessary as to post office interiors, but that there is no evidence that similar measures are required for exterior areas. We do not agree. The

evidence of disruptions at McKnight demonstrates the reasonableness of the regulation as applied to the entrance area of that post office, and although no evidence was introduced concerning the impact of solicitation in an identical area outside Monroeville, officials could reasonably expect similar effects. "[T]he government need not wait until havoc is wreaked to restrict access to a nonpublic forum.... The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius*, 105 S.Ct. at 3453–54.

It is of consequence that defendants placed the tables that they used for solicitation purposes within ten feet of the McKnight entrance, and barely *one foot* from the front door of the Monroeville post office. At such proximity to the entrances, the likelihood of disrupting traffic and disturbing patrons is great, and postal officials were certainly reasonable to act in response.

The district court further observed that the regulation cannot achieve its purpose of preventing disturbances at post offices if it is applied only to exterior walkways within postal premises but not, pursuant to *Grace*, to municipal sidewalks, some of which are immediately outside some post offices. But authorities need not be consistent in their treatment of public and nonpublic areas, and the only question here is whether the regulation of the nonpublic forum reasonably advances the governmental interest. In this case, it clearly does. Moreover, the fact that alternative areas are nearby and available for communication, rather than condemning the regulation, enhances its reasonableness. Not only may defendants engage in solicitation outside postal premises, but they may participate in a wide range of expressive activities on the federal property itself. Significantly, no regulation prevents defendants from distributing literature on the post office property; and such literature may provide the organization's address to persons

who may wish to send contributions to the political cause.

Our decision today does not resolve whether solicitation is permissible *on postal premises* that are at a greater distance away from the entrances to the buildings than is the case here. At both McKnight and Monroeville, walkways appear to be present up to 30 feet from the entrances, and still next to the parking area. Arguably, the Postal Service's restrictions may not be reasonable as applied to walkway locations that are at a great distance from the entrances. It is quite possible that following judicial resolution of various disputes involving the present regulation, the rule will operate no differently from that sustained in *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). There, the Supreme Court upheld a state fair rule which, in order to assure the safe and orderly flow of traffic, barred solicitation as well as distribution of literature in public aisles and limited such activities to a specified booth. As here, the rule in question permitted unencumbered discussion at any place within the public premises.[2]

That the Postal Service singled out solicitation for regulation is also reasonable. It determined: "The solicitation of alms and contributions is an inherently more aggressive form of conduct, and more likely to hinder the orderly transaction of postal business, than is the expression of ideas." 43 Fed.Reg. 38824 (1978). Face-to-face solicitation for money is more likely to be a greater obstacle to the flow of traffic. *See, e.g., Heffron*, 452 U.S. at 665, 101 S.Ct. at 2573 (1981) (Blackmun, J., concurring in part and dissenting in part). Where, as in this matter, the solicitation occurs at the entrance to a post office, it is more likely to delay and harass patrons intent on conducting their postal affairs. "Although the

avoidance of controversy is not a valid ground for restricting speech in a public forum; a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas." *Cornelius*, 105 S.Ct. at 3454.

In *Perry*, the Supreme Court permitted the exclusion of the rival union from access to a nonpublic mail system, in order to preserve "labor peace" in the school district. 460 U.S. at 52, 103 S.Ct. at 959. A similar goal, achieving peace in the federal workplace, justified exclusion of controversial groups from a fund-raising campaign. *Cornelius*, 105 S.Ct. at 3453. The Postal Service was equally reasonable in banning controversial solicitation practices in the areas that are nonpublic forums immediately outside post offices.

Therefore, as applied in this case the regulation withstands First Amendment scrutiny. The entrance areas at issue are nonpublic forums, in which the Postal Service rule advances reasonable and neutral purposes.

### E.

Our approach differs in some respects from that employed by the Court of Appeals for the Seventh Circuit in a similar case. While we do not necessarily disagree with all the views expressed by that Court, we do not find it necessary at this time to follow its analysis. Ours is a narrow decision resolving the propriety of the regulation only as applied to nonpublic forum areas directly outside the McKnight and Monroeville post office entrances.

In *National Anti-Drug Coalition v. Bolger*, 737 F.2d 717 (7th Cir.1984), a group seeking to sell literature challenged the solicitation regulation on its face, and also as applied to those wishing to set up card tables on "ingress/egress" walkways outside post offices in a federal judicial district

---

**2.** In *International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority*, 691 F.2d 155, 163 (3d Cir.1982), in a statement sur denial of a petition for rehearing, I questioned the panel's application of public forum analysis to a race track and stadium, modern centers for public gatherings. But that

case is not applicable here. The decision there upheld a ban on distribution of literature and solicitation applied to *an entire sports complex*. The present matter involves a restriction only on solicitation, and on that specific means of expression only in a *small area* of the public premises.

in Illinois. The appellate court stated that there was insufficient evidence of the configurations of all post offices in the district on which to determine whether to treat the walkways as public or nonpublic forums. But, the panel majority held that, even assuming all walkways were public forums, the regulation was a valid time, place or manner restriction.

First, the court reasoned that the Postal Service's interest in providing prompt, reliable, and efficient service is a significant one, and is properly advanced by the regulation. Such an interest justifies a content-neutral time, place or manner restriction. Second, the majority held that the rule did not sweep too broadly in its application to any post office, citing the Supreme Court's decision in *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

In *Greenburgh,* the Court upheld against constitutional attack a statute prohibiting the private deposit of mailable matter in Postal Service-approved letterboxes. The Court declared that such receptacles, situated in front of millions of homes, are nonpublic forums, and may properly be the subject of broad regulation. In fact, the opinion states, Congress and the Postal Service "must obviously adopt regulations of general character having uniform applicability throughout the more than three million square miles which the United States embraces. In so doing, the Postal Service's authority to impose regulations cannot be made to depend on all of the variations of climate, population, density, and other factors that may vary significantly within a distance of less than 100 miles." *Id.* at 133, 101 S.Ct. at 2687.

The Seventh Circuit held that similar considerations permit broad regulations of the

time, place, or manner of expressive activities in a presumably public forum, that is, the outdoor walkways. But *Greenburgh* concerned *nonpublic* forums, in which "[t]he Government's decision to restrict access ... need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 105 S.Ct. at 3453 (emphasis in original). The *National Anti-Drug Coalition* reasoning may well be correct, but then again it may be that in the context of a public forum the Postal Service's interest in uniform regulation should give way to the normal presumption that regulation of First Amendment activity must be specific and narrowly tailored. *See NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) ("Broad prophylactic rules in the area of free expression are suspect.... Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

In the present matter, involving the reasonable application of a rule to activity in a nontraditional public forum, we need not reach further to decide whether such a rule could, consistent with the First Amendment, apply to property that is a public forum pursuant to the rule of *Grace.* Therefore, we do not follow at this time the approach employed in *National Anti-Drug Coalition.*[3]

### IV.

In summary, defendants may publicly express their views while on postal property, they may distribute political literature, and engage patrons in any lawful dialogue. In fact, they may even solicit financial contributions immediately outside postal premises, and perhaps even on certain portions of postal property. They are simply required not to engage in solicitation at a place

---

3. In another recent case, *American Postal Workers Union v. United States Postal Service,* 764 F.2d 858, 861 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 St.Ct. 792, 88 L.Ed.2d 770 (1986), the court, addressing a regulation limiting voter registration practices on postal premises, held that all those premises are nonpublic forums. The decision did not refer to *Grace,* and thus

leaves questions as to whether the District of Columbia Circuit's opinion should be interpreted broadly. It appears that all the practices before the court in *American Postal Workers* involved activities within post office buildings, in areas that are almost certainly nonpublic forums. *See* 595 F.Supp. 1352, 1354 n. 3 (D.D.C. 1984) (district court opinion).

where such activities would obstruct necessary and nonpolitical post office operations.

We therefore conclude that the solicitation regulation at issue here is reasonable as applied, in a neutral fashion, to certain nontraditional public forum areas immediately outside the entrances to the McKnight and Monroeville post offices, but on post office property, where defendants engaged in soliciting funds. Thus, the district court erred in vacating defendants' convictions for violating this regulation. Its order will be reversed, and the case will be remanded with instructions to reinstate the judgment of the magistrate with respect to the solicitation charges against defendants Bjerke and Brown.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

Today the defendants, followers of Lyndon LaRouche, take up the mantle of the anarchists of the 20s, the Jehovah's Witnesses of the 30s and 40s, the communists of the 50s, the civil rights and antiwar activists of the 60s, the Krishnas of the 70s, and countless other true believers whose fervent desire to spread their deeply-felt—yet, to some, obnoxious—views has been the catalyst for the development of first amendment law. The defendants wish to solicit contributions for their cause on the sidewalks outside of suburban post offices. Undoubtedly, they choose this location for the same reason Willie Sutton chose to rob banks—that is where the money is. Whereas the federal government clearly could criminalize Mr. Sutton's apolitical fundraising activities, defendants' activity, as the majority acknowledges, enjoys the protection of the first amendment, and the government's power to criminalize it is correspondingly limited. Thus, we must look to the signposts established by the defendants' often quixotic forerunners in order to determine whether their convictions may stand. Because I believe the majority misreads those signposts, especially *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) and *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211,

47 L.Ed.2d 505 (1976), and goes astray in holding that the sidewalks in question are not traditional public fora, and because I cannot subscribe to the majority's intimations that the postal regulation in question would be a constitutionally permissible restriction of speech in a public forum, I respectfully dissent.

As the majority recognizes, consideration of regulations abridging freedom of speech on public property requires that we undertake a "forum" analysis:

> [T]he extent to which the Government can control access depends on the nature of the relevant forum. Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.... Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."

*Cornelius v. NAACP Legal Defense and Educational Fund,* —— U.S. ——, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (quoting *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).

" '[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' " *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707. According to the majority, this category includes sidewalks outside of the Supreme Court Building in Washington, D.C., as *Grace* holds, but not sidewalks outside of two suburban post offices in Western Pennsylvania. Their opinion seizes upon language in *Grace* that notes that the sidewalks in issue there were in-

distinguishable from any other sidewalks in Washington, D.C., 461 U.S. at 179, 103 S.Ct. at 1708. Here, in contrast, the majority emphasizes that the sidewalks were separated from the streets by parking areas. On this basis, the majority concludes that the sidewalks here are not traditional public fora. The majority does not, however, explain why this is a difference that matters in first amendment analysis, stating only that "any person who has crossed the McKnight or Monroeville parking lot and stepped onto a walkway adjacent to the post office has entered an enclave separated from the public thoroughfare. The government is permitted to maintain such nonpublic enclaves." Majority at 649. I must note that there is something fundamentally paradoxical about designating as "nonpublic enclaves," the sidewalks which the public *must* use to gain access to *public* post offices. However, assuming that the majority is correct that "any person who has crossed the McKnight or Monroeville parking lot and stepped onto a walkway adjacent to the post office has entered an enclave separated from the public thoroughfare," I do not see why this matters. I am unable to fathom why the government's power to restrict speech-related activities on a public sidewalk depends on whether the sidewalk is separated from the street by a parking area. I do not believe the majority would hold that a municipal sidewalk loses its public forum status because parallel or diagonal parking is permitted at curbside, yet I do not see how that situation is distinguishable.

I believe that the majority has been led astray by some rather imprecise dicta in *Grace.* There the Court was called upon to distinguish *Greer v. Spock, supra,* wherein it had held that sidewalks within the Fort Dix military compound were *not* traditional public fora. The *Grace* Court stated:

> In *Greer,* the streets and sidewalks at issue were located within an enclosed

military reservation, Fort Dix, N.J., and were thus separated from the streets and sidewalks of any municipality. That is not true of the sidewalks surrounding the Court. There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave.

461 U.S. at 179–180, 103 S.Ct. at 1708–1709.

Though in *Grace* the Court noted the absence of fences or other forms of separation, it is clear from even the most cursory reading of *Greer* that it was not such *physical* features that made Fort Dix "some special type of enclave." Indeed, the Court noted at the outset of *Greer* that the "main entrances to Fort Dix are not normally guarded, and a sign at one of the entrances says 'Visitors Welcome.' Civilians are freely permitted to visit unrestricted areas of the reservation." 424 U.S. at 830, 96 S.Ct. at 1214. It was not the lay of the land that concerned the Court, but rather "the special constitutional function of the military in our national life," 424 U.S. at 837, 96 S.Ct. at 1217, the concomitant power of commanding officers to summarily exclude civilians from their area of command, 424 U.S. at 838, 96 S.Ct. at 1217, and the need to insulate the military "from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates." 424 U.S. at 839, 96 S.Ct. at 1218.[1] Needless to say, such considerations do not obtain on the premises of a suburban post office. The majority's assertion that the "factual situation in this case is … more analogous to the sidewalks in the military reservation in *Greer* than to the public sidewalk in *Grace*," Majority at 649, is utterly unconvincing, and belied by the frequency with which federal courts and post offices are housed in the same buildings. Under the majority's rea-

---

1. Conversely, where the military has "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets," on streets or sidewalks nominally within its bases, such property may again become public fora,

though the geography and topography remains unchanged. *Flower v. United States,* 407 U.S. 197, 198, 92 S.Ct. 1842, 1843, 32 L.Ed.2d 653 (1972) (per curiam).

soning, the public protest rallies that often take place at the south entrance to our courthouse in Philadelphia could be ended by constructing a driveway to separate the entrance from busy Market Street, even though the function of the building and entrance would remain entirely unchanged. Such a result would be as unfortunate as it is illogical. Nor do I find it helpful, as apparently does the majority, to note that the Postal Service's basic function is to provide postal services, not public fora. Majority at 650. As the Supreme Court noted in *Grace*, "[t]raditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." 461 U.S. at 180, 103 S.Ct. at 1708.

I do agree with the majority that this case provides no occasion for setting down a per se rule regarding all possible configurations of off-street sidewalks on public property, yet I fear that by holding that the mere presence of a parking area between the street and a sidewalk limits our scrutiny of speech-related regulations to the standard for nonpublic fora, we issue an open invitation for government architects and landscapers to surround public buildings with modern-day moats. In *Grace*, the Supreme Court made it clear that the government may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property." 461 U.S. at 180, 103 S.Ct. at 1708. I think it is equally clear that the government may not accomplish such a result through architectural expediency. Private developers of shopping malls and office buildings may enjoy such a prerogative, but public property stands on an entirely different footing. As Judge Adams has written in a similar context: "Changes in patterns of social organization and interaction have drastically altered the nature of places offering meaningful opportunities to speak.... [L]egal concepts need to evolve to reflect underlying social realities." *International Society for Krishna Consciousness v. New Jersey Sports and Exposition Authority*, 691 F.2d 155, 163 (3d Cir.1982) (Statement on Denial of Petition for Rehearing). It is but an incremental, evolutionary step from recognizing public sidewalks abutting streets as public fora to so recognizing public sidewalks separated from the streets by parking areas—an increasingly common configuration that promotes safety and convenience, but is not inconsistent with free speech. I would hold that the sidewalks in issue are traditional public fora.

Because the sidewalks are traditional public fora, the postal regulation may be sustained only if it is a reasonable time, place, or manner restriction. *Grace*, 461 U.S. at 177, 103 S.Ct. at 1706. Though the majority strongly hints that it would uphold the regulation even under this level of scrutiny, I cannot agree. A valid time, place, or manner regulation must be content-neutral, narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *Perry Education Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Clearly, this is not a reasonable "time" regulation—it applies at all times, even when the post office lobby is closed. Had the Postal Service only banned solicitation during peak periods of customer traffic, we would have a different case before us. Similarly, this cannot be characterized as a "place" restriction, as it bans solicitation throughout the forum in question. A regulation requiring that persons soliciting for contributions remain a certain distance from the doors, for example, might stand on a different footing. That leaves only the possibility that the regulation is sustainable as a "manner" restriction. Apparently this is the view of the majority, as they state—albeit in another context—that "it merely deprives the speaker of one *means* of expression [*i.e.*, solicitation] found disruptive by Postal Service officials." Majority at 650 (emphasis added).

The majority makes a category mistake. Solicitation is not simply a "means" of expression interchangeable with other "means" of expression, such as picketing or dancing, but rather it is a term broadly inclusive of a "variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Village of Schaumburg v. Citizens For A Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980). The government has no greater authority to ban solicitation outright in a public forum, regardless of means, than it has to ban "communication of information" or "advocacy of causes." Solicitation may be carried out by any of a number of "means," such as singing folk songs and passing a hat, dressing as Santa Claus and ringing a bell beside a kettle, "trick-or-treating" for UNICEF, or attempting to set a Guinness World Record for hopscotch. Solicitation must, to the greatest extent possible, be accommodated in a public forum. (The record shows, incidentally, that the Kiwanis were permitted to maintain gumball machines—another "means" of solicitation—at the entrance to at least one post office in the area. I do not mention this to suggest that this made the entrance a designated public forum, or that the prosecution at issue is content-based, but rather to show the feasibility of accommodating some nondisruptive means of solicitation.)

The majority acknowledges that the only evidence in this record to indicate that defendants' particular activities might be incompatible with their chosen forum was the testimony that some customers at McKnight complained to the post office personnel, and that some bulk mailers began to arrive late in the day in order to avoid defendants. Majority at 645. But as Justice Douglas wrote long ago, one may not be convicted for public forum speech because it "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance":

[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

*Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) (citations omitted.)

*Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) provides an apt illustration of a permissible "place" and "manner" regulation of solicitation in a public forum. A rule of the Minnesota State Fair forbade the distribution of any merchandise or literature except from rented booths available on a first-come, first-served basis. Members of ISKCON wished to mingle with the crowds and approach fairgoers to sell literature and solicit donations. The Court held that the rule advanced the significant interest of reducing congestion at the fairgrounds. More important for our purposes, the Court found that the rule was narrowly tailored and left open adequate alternative channels: "[T]he rule does not exclude ISKCON from the fairgrounds, nor does it deny that organization the right to conduct any desired activity at some point within the forum. Its members may mingle with the crowd and orally propagate their views. The organization may also arrange for a booth and distribute and sell literature and solicit funds from that location on the fairgrounds itself." 452 U.S. at 655, 101 S.Ct. at 2567. In contrast, the regulation before us now permits no solicitation by any means, at any place or any time, within the forum in

question. As such, it is substantially over-broad. Defendants' convictions must be reversed regardless of whether the Postal Service might have constitutionally prohibited defendants' manner of solicitation—at the times and places in question—under a more narrowly-tailored regulation. *See generally Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796–801, 104 S.Ct. 2118, 2124–2127, 80 L.Ed.2d 772 (1984). Accordingly, I would affirm the judgment of the district court.